141327 C.W. Downer & Company v. Bioriginal Food & Science Corporation. Well, Mr. Torres, from the First Amendment to the Due Process Clause. Yes, good morning, Your Honors. May it please the Court. Stephen Torres for the Plaintiff and Appellant, C.W. Downer & Company. Yes, we have before the Court today, I would submit a very important jurisdictional issue. Because if the District Court decision is allowed to stand, then it would extend by a large measure, the extent to which a foreign or out-of-state business would be allowed to contract with a local provider of goods or services, here, Downer, a provider of professional services, as an investment bank based in Boston, and then be allowed to receive the benefit of the goods or services it receives, and not be subject to jurisdiction in a lawsuit seeking redress when the out-of-state entity has failed to pay. Here, the parties agree that the standard of review for the District Court decision is de novo, and the parties also agree on the three-part test that the First Circuit applies in determining whether or not there's personal jurisdiction. Before I get to the three-part test, though, I think it's important to just run through quickly the nature of the engagement, because I think it distinguishes the instant case from any of the other cases, either relied upon by the District Court or cited by my brother. Here, the nature of this engagement is, by original, a company in Canada retained Downer to perform the assignment, which is called in the contract, Downer is called upon to be their exclusive financial advisor for the potential sale of the company. Well, given what the nature of that assignment is, it's the sale of the company. There could be nothing more important, so it was extremely important to the company, number one. Number two, the duration of this engagement lasted over four years. So because of the import of the engagement and because of the duration, we have four years worth of systematic, repeated, and continuous contacts that are uncontested in the record. We put before the court an affidavit and attached examples and instances of teleconferences, of email that were exchanged, of draft iterations of documents, and importantly, payments that were made. In this instance, the nature of the engagement was tiered. So the company, by original, paid Downer installment payments. All of the basic work was done in Massachusetts, was it not? In other words, preparing the presentations, the documents, and that sort of thing was done? A hundred percent, Your Honor. It's uncontested. And then sent to Saskatchewan? That's true. And it was given the nature of the assignment, there were 11 different tasks that Downer was supposed to undertake. And to prepare the company to be potentially sold to would-be suitors, by original was a private company. Downer had no prior relations with by original. The only way that it could prepare those types of detailed papers and presentations to send out, and in this case, they went through 11 iterations just to put together an information memorandum. All of that work was done in Boston. There's no allegation otherwise. Wait a minute. It may have been finalized in Boston, but as I understand it, drafts were sent to Canada. They were commented on. They were revised. They were sent back. Then another document goes back. We've accommodated your changes, so on and so forth. Isn't that what happened? Absolutely. That's a hundred percent correct, Your Honor. Eleven iterations in one instance of the information memorandum went back and forth. In instances such as the information memorandum, they had teleconferences where by original had its CEO, was based in Saskatoon, Saskatchewan. They had the company founder who was also on it. By original formed a subcommittee to work with Downer, which included the CEO in Saskatchewan, the company founder who was in Virginia, and then the company's de facto board chairman and a board member, a man named Mr. Johnson, who was in Toronto. Now, those individuals working on by original's behalf in each instance conferred with Downer. There's no contest that the conference calls, the emails, and the draft iterations that they worked on in each instance were sent to Downer in Boston, and by original knew as much. The email signature blocks listed Boston. They sent their payments to Boston when Downer met certain milestones. There were four milestones contemplated in the letter agreement. Downer met the first three. The first instance, when they signed the letter agreement, which they signed and sent and directed to Downer here in Boston, triggered the first milestone payment. They sent the check to Boston. The second instance, when Downer finished that information memorandum after 11 iterations, they sent a wire transfer to Downer's bank in Boston. The third time, when they had some potential suitors who were interested, and they put together a management presentation, that triggered the third milestone payment, and this time another check to Boston. Does Downer have any other North American office besides Boston? They do not. They have other offices. They're all outside of the U.S. Could you answer one thing that's just a wrinkle in the record, and maybe I've misunderstood it. When did they contend, by original, that the agreement was terminated? Yes, so from Downer's perspective, the agreement was never terminated. They never provided written termination. I'm sorry, by original. When does by original contend that it was terminated? It's my understanding, and they've never articulated it to any extent, they've told Downer originally that we terminated you in 2009. Yes, so just for purpose of the jurisdictional complication, how can we, most of the contacts you're talking about are post-2009 contacts. Oh, that's. All of this iteration that you're talking about now. Is after they sign the letter of agreement. But it's after they contend the agreement terminated. Oh, no, that's not true. They would say the agreement terminated at the end of 2009. There's no way they could say it was sooner. When was the agreement forged again? It was signed in March of 2009. In April, May, June, July, they do the information memorandum. In October of 2009, Downer does the board presentation, because they have some potential suitors who are interested. So how much of the contacts, you contend the contacts persist until when? We say the contacts persisted right through until we learned after the fact that the company had been sold. They reached out to us. So I guess my question, just to figure out how to think about this, how do we consider the post-2009 contacts for purpose of a jurisdictional question without getting into the merits of whether the agreement was terminated in 2009? Well, I mean, the agreement calls for written termination, and there's no written termination in the record. But I think we, aside from the fact that we think they're just flat wrong on that, they reached out to us in 2011 and asked us to perform additional work, and that work is in the record. We continue to do work with them and communicate with them. We arranged for a conference call after we had prepared this. We updated their board and did this M&A update. They asked us to survey the marketplace to get a sense as to whether or not it was a good time to continue to seek a transaction. I come back to the fact there is no case that has this level of detail, this level of interaction, this level of collaboration, and has found that there is no personal jurisdiction. So you claim that they meet all three prongs of the test? Yes, absolutely. But they're going to argue, I'm sure, that in the contract itself it said that Saskatchewan law would apply. Yes. Now, it doesn't say, as I understand it, that the only court which can hear the case is the court in Saskatchewan. That could have been done, I suppose, but they didn't do that. That's true. Now, is it also true that the initial meeting was held here in Boston with a man who was either an executive of the company or chairman of the board or at least an executive of the company which had the money in the company? Yes, I think that that first meeting is something that they haven't been able to reconcile. And I think it is extremely important, the fact that the first contact that existed before these companies, they had never done business before, the gentleman's name is Mr. Johnson. He was a board member for BioOriginal. He was the representative who was responsible for 20% of the existing shares of BioOriginal through a company he worked for called Crown Capital. He was on the subcommittee charged with selling the company. And by their admission, they elevate him to de facto chairman. Whether or not he was the chairman or not, he was certainly a board member. He mentions it. You know, we don't have any details about why he was at Downer. He may have been there for some other purpose. And he casually mentions over a cup of coffee, by the way, I know you're in this business. Sure. Probably looking for somebody. Even assuming, Your Honor, this is correct, that he casually mentions it. They're a private company. We had no way of knowing that that opportunity existed or that he mentions. I know that you're an investment banker that advises companies on transactions. A company that I'm very closely affiliated with, which you don't know, is about to engage in a sale process over the next 12 months called Mr. Vidal. That's the first step in a chain. He says call Mr. Vidal. He certainly says that the company is going to be offered for sale in the next 12 months. The affidavit then says we make the contact to Mr. Vidal. We don't contest that we call Mr. Vidal. But when we call Mr. Vidal in Saskatchewan, we're not cold calling him. We're calling out the behest or at least at the reference of Mr. Johnson. And is Mr. Johnson important? Of course he is. Mr. Vidal then says in his affidavits that he relied upon advice that he got from Mr. that he received from Mr. Vidal in negotiating the terms with Donner. So we say that if not for the first meeting in Boston at Donner, we wouldn't be here today. So we don't say that we rise and fall. We don't rise and fall based on that fact, but it's certainly the first. It's the first in the chain of events. Subsequent to that, for purposeful availment purposes, I should start quickly with relatedness, but they send the contract to Boston signed. Donner performs the contract, and then Donner sues them because they don't make the final payment and the success payment. I submit to the court that's sufficient for relatedness purposes, and courts have found on a contract where it's a breach of contract basis is the nature of the claim, that's sufficient for relatedness. R&B Splicer was a case, same thing. They just found a contract with a Massachusetts connection, gave rise to the lawsuit. That was relatedness. And if you look at the other components that courts look to, the district court in this instance said, well, the decision not to pay was a decision that was made in Canada, but that's troubling for two reasons. Number one, the informed injury is something that courts look to for relatedness analysis, and the informed injury was here that Donner bore when they weren't paid. And then second of all, courts have also found that faxes, emails, letters, and then in this case, payments. We have a series of payments where they were sending payments to Donner in Boston. So we say, is this lawsuit related to the informed activities? Absolutely. But to get to purposeful availment, the cases that have been relied upon for no jurisdiction focus on either guarantors, like in Bond Leather, or instances where a company just sat back and awaited payment, promissory note cases like Adams v. Adams, Phillips Exeter where the school waited to receive a charitable contribution, BCCT versus Summerdale where the court said there was a Massachusetts investor was waiting to see if there were going to be any returns from an investment in Georgia. That's not the case. That's not the circumstance we have here. We don't have unilateral activity. We have four years of interaction. And they knew it was going to be interactive in nature because they hired us to be their financial advisor. How could we advise them and work with them in selling the company if they didn't assume that they were going to be in constant communication with us? I mean, the hallmark of purposeful availment is voluntariness and foreseeability. Counsel, not to stop your stream, but one thing that has concerned me is both parties rely a great deal on federal case law interpreting Massachusetts case law. And it would seem to me that in this area of doing business over the Internet, that the state courts would have addressed these issues. What are your best Massachusetts cases? Well, the cases I think that have come the closest we would say would be our federal cases, the Dainard versus Ness Motley cases, an instance where services were provided here. All right. In terms of state court cases, there are instances that have been cited for the Nichols case that we would say is inapposite. There was another case with the, let me get the name correct, where there were two wine merchants, 11 emails over four days, and the court found that there was no jurisdiction in that instance because it was a passive purchaser simply sitting by and waiting to receive an order, which is an instance that we distinguish ourselves from. The case of Whitaker is a First Circuit case in which there were three purchasers of goods, and the court found one of the purchasers was an active purchaser subject to jurisdiction, but the other two were passive purchasers. Here we say by our original, by any stretch, has to be considered an active purchaser and not a passive purchaser of goods or services given the four years of constant contact and constant communication. Thank you. Okay. Thank you very much. Thank you, Your Honor. Mr. Rose. May it please the Court, Your Honor. I'm Alan Rose, Jr. from Rose, Chinooks & Rose. Victoria Fuller is here with me, who is an associate in my office. A couple of points that go to the questions that the Court raised during my brother's argument. We don't believe that the nature of the relationship, in this case an investment banking relationship, or the duration of the relationship matter for purposes of minimum contacts analysis. What matters, the critical issue, and the First Circuit's been clear about this, is what the nature of the contacts are between the defendant and the forum. And here, the nature of those contacts are too limited to confer jurisdiction in the district court. When your client made this contract with his client, they had to assume that the work was going to be put together here in Massachusetts. We're living in a world where lots of things are going to be done electronically, remotely. The ads all say, you don't have to come here. We're going to do this in a very different way. We can Skype. We can do all kinds of things today. Here your client makes a contract with a Massachusetts business, which is going to do the basic work, put it together here in Massachusetts. Why isn't that purposeful availment? Well, I hope this isn't quibbling, Your Honor, but there's nothing in the letter agreement. And there was no explicit agreement about where the investment bank would perform the work. Your client knows that they didn't have an office in Saskatchewan. Their office was here in Boston. Their people who did the work were here in Boston. Why is it a reasonable assumption to assume, not only assume, to know that that's where the basic work is going to be put together? Because it is not either voluntary or purposeful availment, as the court looks at it, where a party guards against being hailed into court here by having a venue selection and choice of law provision in an agreement. But that's precisely the point. It wasn't written to preclude a Massachusetts forum. Well, I do take issue a little bit with that, Your Honor. I know that the First Circuit case law on permissive and mandatory jurisdiction sets up a pretty stringent test for what is mandatory jurisdiction in these types of clauses. But this clause is pretty strong. It's Saskatchewan law, and it says that disputes will be submitted to the jurisdiction of Saskatchewan courts. So I do think that Bio-Original, in this case, guarded against being hailed into court here. And therefore, it is not foreseeable to them that they will be hailed into court here. And if you switch over to- It's true. It granted jurisdiction, in a sense, to the Saskatchewan courts. But a good lawyer would have added another clause, and that wasn't done here. Well, Your Honor, as I said, I concede that this is not a so-called mandatory jurisdiction provision. But nevertheless, it clearly sets forth what the expectation of two very sophisticated parties are about where disputes are going to be resolved. And whether you plug Section 8.2 into purposeful availment or you plug it into your analysis of reasonableness, it's clear what the parties intended. They're going to settle disputes under Canadian law in Saskatchewan. It's not so clear, because if it was clear, your client would have insisted on a clause which made it mandatory that the only place there was jurisdiction was in Saskatchewan. They didn't do that. They did part of that, but they didn't do that. You can have contracts where somebody's going to say, well, we're going to use the law of X, but that doesn't mean that there is jurisdiction somewhere else. Well, look, I've already conceded the point that it's not a so-called mandatory clause. But even sophisticated counsel negotiating agreements may not be in the weeds on First Circuit jurisprudence about mandatory versus permissive jurisdiction clauses. This one does a pretty good, if not perfect, job at setting the expectation of the parties. So even if it's not- Can I go back to your statement that the nature of the relationship and the duration are irrelevant as you read First Circuit law? But putting goods in commerce, Campbell's soup can that gets bought in a store in Massachusetts, does strike me as being different than a professional services contract that is supposed to last for several years or until success. I don't know of any cases that say the nature of the relationship and the duration are irrelevant, and it doesn't strike me as a sensible rule. I guess the way that I would put it is that it tips the analysis on its head because it looks at what the plaintiff is doing in the forum instead of what the defendant is doing in the forum. In this case, I'll give you some uncontested facts from the record that go to the key point in the analysis. What did BioOriginal do such that it should anticipate being hailed into court here? There's no travel to Massachusetts by BioOriginal during the course of the negotiation of the contract. That's in the record at page A48. But Burger King makes clear it doesn't have to be physically present in the forum. I agree. I'm not saying that this fact alone is dispositive. I'm saying that on total, these facts, which are uncontested and are in the record, tip the scale in our favor such that this court does not have jurisdiction. I'm not saying that this lone fact is dispositive. But what you do know from the record at A48 is that no one from BioOriginal traveled to Massachusetts during the negotiation of the contract. Mr. Vidal, the CEO, executed the contract in Canada. That's in his affidavit at paragraph 10. It's A47 in the record. During the course of the engagement, while there are communications and we concede that, no one from BioOriginal traveled to Massachusetts to oversee the work or meet with Downer in Boston, Massachusetts. All of the defendant's communication with respect to the carrying out of the engagement occurred or originated in Canada. All of these points are the same point, which is that your company was never physically present in Massachusetts. That's correct, Your Honor. But Burger King says that's not dispositive of the question. So I guess I just am not grasping. Here you have a relationship between two companies by design, a professional services relationship that's going to be ongoing, relatively intensive. That's either going to be done by the two of them meeting physically or it's going to be done through phone calls. Burger King says it doesn't have to be done physically. So here it was done through phone calls. If there's an intense relationship that doesn't manifest itself in physical presence, who cares? Because I think you have to look at the nature and the quality of the contacts. And, for example, in the Phillips Exeter case, there was an agreement where certain payments would be made by a trust to the school in New Hampshire. There's an instance of travel in that case with respect to that. There's back-and-forth communications. There's payments made by the fund in Florida to the school in New Hampshire. And in that case, the court found that there was not jurisdiction. The school hadn't hired a fundraising consultant in another state to advise them on conference calls and phone calls over the course of three years. If they had, maybe it would come out differently. And why isn't our case a lot like that case? I think our case is very similar to Phillips Exeter. No, no, the case of if they had hired a fundraising consultant in another state to advise them over the course of three years how to get their endowment higher. That would be a lot more analogous, it seems to me, on the facts to the facts of this case than the facts of the Phillips case itself. In your example, Your Honor, I think it would depend on whether or not there was travel into the forum, how many communications there were, whether or not other institutions were there. How many communications were there here by your count? I don't have a specific count. Is it hundreds, thousands? I don't believe so, Your Honor, no. Hundreds? No, I don't believe so, Your Honor. I believe what's in the record, and it's attached to Mr. Colon's affidavit and it's alluded to in Mr. Vidal's affidavit, is that there are a handful of communications. I don't have a specific count for you. And there are documents which are sent from here, finished documents to your client which your client uses. I don't dispute that, Your Honor. But, again, that's looking at it from the perspective of what the plaintiff did here in Massachusetts. And the court's analysis has to focus on what the defendant did in Saskatchewan. Well, the problem I guess I'm having is that in the day and age we are now in, there will be far less face-to-face communication among people. There's going to be more of this kind of distant relationship. And are you saying that every one of these cases, or most of them, there will be no jurisdiction? You have to be saying that. Because what you're really saying is if somebody had come here, that's different. Because nobody came here, even though they used everything which was produced here. That isn't enough. Well, I think it's fact-intensive. But I think in this case, on these level of contacts, with Downer's work performed here and BioOriginal's lack of travel into Massachusetts, that there's no jurisdiction here. I think perhaps as the contacts ramp up, even without physical presence, that perhaps at some point the analysis might change. But not on these facts and not with Section 8.2 in the contract. I believe that that tips it in our favor here. At one point, and this really goes to reasonableness, and there's some quibbling about whether or not certain witnesses are important. So let me cut through that. Whoever the defendant's witnesses are, they're from Canada. They're located in Canada. And whatever needs to be proved or disproved in the case, that's where our witnesses are. We have no office here. We have no employees here. We do not do business here in our line of work, which is selling nutritional supplements. And I might put it one other way for the court. The courts frequently look to see whether or not the defendant has solicited or done business here. We didn't do our type of business, the sale of nutritional products here in Massachusetts. We engaged a professional services organization to perform certain services. And you engaged them knowing that they would be doing the services here. And you spoke with them here. And you emailed them here. And you faxed them here. I think the question that we always get back to is, what is enough? And I guess in your view, the major issue which you feel cuts you away is the section on choice of law. I do think that the choice of law provision and the second sentence of that, which is a venue selection provision, matters a great deal. And one of the cases that my brother relies on, the PestMill case, in which Judge Gorton analyzed some of these same issues, he comes out and says in that case it's a close question. And he notes in there that it likely would have been different if there had been a form selection clause because a defendant can guard against being hailed into a court in another jurisdiction by entering into a contractual provision that provides just that. And we do have that in this case. So I do think that that — Just so I get the argument on that point, so one argument is that there is a binding form selection clause and that just ends the matter, right? The separate argument is that there is no binding form selection clause, but it's relevant to what in the analysis? I'm not sure I understand your question, Your Honor. There are mandatory forum selection clauses which have to be drafted in specific ways that divest a district court of jurisdiction by their language. This is not such a clause. Correct. So given that we don't have that, the existence of this clause, which doesn't do that, is relevant to the jurisdictional analysis how? Two ways. It's related to prong three, which is reasonableness, and it's related to prong two, for purposeful availment. The district court in this case alluded to it in both contexts. I think the court can plug it in where it sees fit, but I think it goes to both of those. Can you just flesh out how it fits with purposeful availment if it doesn't divest jurisdiction? In other words, how does it count in your favor with respect to personal availment? Why isn't it just sort of beside the point? One-word answer, foreseeability. Where you've entered into a contract that provides that you're not going to litigate in Massachusetts, you're going to litigate in Saskatchewan, that second prong of purposeful availment, foreseeability, I think it's not foreseeable that you're going to be litigating in Massachusetts. It's foreseeable that you're going to be litigating in Saskatchewan. But I think also it goes to the third prong as well, and whether or not it's reasonable to have a foreign defendant litigate in Massachusetts, where it is agreed that litigation will take place elsewhere. And, again, at the expense of belaboring the point, it's not mandatory, but it's still highly relevant to those two inquiries that the court needs to conduct. One point about the district court's decision. I see that I'm getting low on time. They have the burden of proof on all aspects of the jurisdictional inquiry. So if the district court got any part of its analysis correct, there's still no jurisdiction, and we prevail in the matter. Thank you very much. Thank you.